JOHN S. LEONARDO
United States Attorney
District of Arizona
KAREN E. ROLLEY
ARTURO A. AGUILAR
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
Email:  karen.rolley@usdoj.gov
arturo.aguilar@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>     vs.<br><br>Marques West,<br><br>          Defendant. | No. 13-CR-01493-TUC-CKJ-CRP<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

Now comes the United States of America, by and through its attorneys undersigned, and files its Sentencing Memorandum in the above-captioned matter. This matter is scheduled for Sentencing on June 26, 2014.

**Prior Proceedings**

On August 28, 2013, a federal grand jury returned an indictment charging the defendant Marques West ("West") with violating Title 18 United States Code sections 1591(a)(Sex Trafficking of Minor and by Force, Fraud or Coercion); 1594(c)(Conspiracy to Commit Sex Trafficking); and 2423(a)(Transportation of Minor for Prostitution).  On April 17, 2014, pursuant to a written plea agreement, West pled guilty to Count 3 of the Indictment,  Title 18 United States Code, §2423(a), Transportation of a Minor with Intent to Engage in Prostitution.  The plea agreement provides that the parties stipulate and agree to a sentencing range of 144-216 months imprisonment.  This sentencing range

reflects an upward variance or departure from the advisory guideline range applicable to Count 3, Transportation of Minor for Prostitution (18 U.S.C. §2423(a)), as one of the Counts to be dismissed at Sentencing requires a minimum sentence of 180 months for a Criminal History I Offender. (Plea Agreement "PA" p. 3, ¶ 8).

For the remaining Count (Count 3), the U.S. Probation Department calculated West's Total Offense Level as 31 and his Criminal History Category as II, resulting in a sentencing range of 121 to 151 months. The Probation Department also noted the impact of the plea agreement on sentencing. (PSR p. 11; ¶¶68, 69).

## Summary of Facts

On January 29, 2013, FBI agents received two leads from the National Center for Missing and Exploited Children (NCMEC). One of the NCMEC leads included a copy of an advertisement on backpage.com for a "two girl special" and information that two people, known as Nadia and Nadia's boyfriend, were traveling with a Minor known as "Redd."[1]  The other lead referenced a similar backpage.com advertisement. The FBI contacted the Tucson Police Department (TPD) who subsequently set up a sting operation. Officers located an ad on backpage.com which advertised the services of "Redd" with a caption that read "ask about my 2 girl special." Officers also determined that there were three ads associated with this phone number on three different dates.[2]

A TPD officer (UC) contacted (through texts and phone calls) the phone number listed in the advertisement and made a "date" with a female. The female told the UC that the price for "full service" from both girls was $200.00. The UC arrived at the Red Roof Inn on Irvington Road and met two females in the motel room. One of the females

---

[1] This advertisement had the caption "60 RoSe SpEciAL SuPeR FrEak!! W*T AnD ReAdY ALL NiTe!!-19" within that advertisement, photographs of females were attached.

[2] The tip to NCMEC was an advertisement that provided another phone number. The subscriber information for this phone number belonged to Marques West.

identified herself as "Redd" and the other female identified herself as "Nadia."³ The UC confirmed a specific sex act with both females in exchange for money. The UC handed the prerecorded United States Currency ($200) to "Redd". After the UC handed the money to "Redd," he left the motel room under the pretense that he was going to get drugs for them to use before they had sex.

Once the UC left the motel room, Marques West entered the same room. Officers arrived and arrested West and Wells for state charges of pandering and prostitution. On his person, West had half of the money that the UC gave "Redd." "Nadia" (Wells) had the other half of the buy money. Shortly after the arrest of the defendants, the victim, who was a Texas Child Protective Services ("CPS"), ran away from a Tucson group home before she was scheduled to return to Texas with her CPS caseworker. The FBI continued the investigation, taking steps to locate the victim in order to proceed with the matter federally. (See Nature and Circumstances, *infra*, for additional facts relating to this offense).

In the meantime, West and Wells were released from state custody and subsequently traveled to El Paso, Texas, where they engaged in the promotion of prostitution. They were arrested in El Paso for that crime on April 30, 2013. (PSR p. 7, ¶38).

**Argument**

In fashioning a just and reasonable sentence the Court, in addition to calculating the advisory guidelines, must also consider the factors presented in 18 U.S.C. §3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The following is a discussion of the relevant §3553(a) factors for consideration in this matter.

<u>Advisory Guidelines Range</u>:

The Court must first consider the applicable guidelines range under §3553(a) (4).

---

³ "Nadia" was subsequently identified as the co-defendant Champaign Wells and "Redd" was the identified as the minor victim. The Red Roof Inn room was registered to Champaign Wells and another room was registered to Marques West.

1  The guideline range contained in the PSR and the plea agreement is properly calculated
2  in this matter. The Court may rely upon this as a starting point. See, *Rita v. United States*,
3  551 U.S. 338, 347-48(2007) (district court should begin by correctly calculating the
4  applicable guidelines range).   Once the Court has determined the appropriate sentencing
5  range, it should then consider that range in light of the other relevant §3553(a) factors.
6  *Gall*, 552 U.S. at 49-50.

7  The plea agreement provides for an upward variance in exchange for the dismissal
8  of the remaining counts in the Indictment that are applicable to West.[4]  The range of
9  imprisonment in the plea agreement based upon the offense level and the defendant's
10  criminal history is a range of 144 to 216 months imprisonment.  Had the defendant pled
11  guilty to all three counts in the Indictment his sentencing range under the advisory
12  guidelines would have been 235-293 months, based upon a total offense level of 37 and a
13  criminal history category of II.[5]  The sentencing range in the plea agreement clearly
14  demonstrates that West received a significant benefit.

15  The U.S. Probation Department correctly determined that defendant West's
16  guidelines range is 121 to 151 months for the offense of conviction, including the
17  appropriate enhancements.[6] (See PSR p. 5, ¶¶ 20-22; PA p. 3, ¶7).  The Total Offense
18  Level is correctly calculated at level 34.  The defendant is also given 3 levels off for
19  acceptance of responsibility, which yielded a total offense level of 31.  However, for the
20  reasons stated below the Court should find that the range of imprisonment contemplated
21  in the plea agreement, reflecting an upward variance or departure in return for the
22  dismissal of the remaining counts, (PA p. 3, ¶8) is appropriate in this instance.

---

[4] Particularly, Count 2 provides for a mandatory minimum sentence, upon conviction of 15 years.  The maximum penalty under this statute is imprisonment for life.

[5] This calculation is from the Preliminary U.S.S.G. Report prepared for the parties by the U.S. Probation Department.

[6] Specific Offense Characteristics include the rebuttable presumption that the defendant unduly influenced the minor to engage in sexual conduct, U.S.S.G. §2G1.3, comment n. 3(B); use of computer to solicit a person to engage in sexual conduct with minor, U.S.S.G. §2G1.3 (b) (3); and the offense involved the commission of sex act or contact, U.S.S.G. §2G1.3 (b) (4) (A).

Consideration of the Section 3553(a) Factors:

The Court is not required to discuss each §3553(a) factor individually, as long as it is clear from the court's opinion that it considered the factors in determining the appropriate sentence. See, *United States v. Carty*, 520 F.3d 984, 992-993 (9th Cir. 2008) (en banc). After considering the factors set forth in 18 U.S.C. §3553(a), the Court should sentence West to the high end of the plea range, 216 months imprisonment. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in §3553(a)(2), which include, but are not limited to, the need to reflect the seriousness of the crime, deter the defendant from criminal conduct, promote respect for the law and to protect the public from further crimes. The relevant §3553(a) factors are discussed herein.

Nature and Circumstances of the Offense:

The nature and circumstances of West's offense call for a sentence of 216 months imprisonment. In addition to the facts surrounding his arrest on January 29, 2013, the investigation of this matter, including statements of the defendants and the victim; forensic examination of cellular phones; and corroboration through keeper of records documents, demonstrate that a sentence of imprisonment at the high end of the plea agreement sentencing range is fair and reasonable.

Sometime in mid-to-late January 2013, Joe "Black" Williams, an associate of West, picked up the victim in El Paso, offering her a ride. The victim wanted to go to the local bus station. Instead, Williams took her to a motel where West and Wells were engaged in prostitution activities.[7] West and Wells were introduced to the victim as boyfriend/girlfriend.[8]

---

[7] Co-defendant Wells had been with West for almost two years, working in a pimp/prostitute-type relationship. West had primary control of the prostitution operation and proceeds derived therefrom. Wells, in addition to working as a prostitute, assumed the role of "bottom," by supervising the victim's activities.

[8] Wells believed that she and the defendant were in a boyfriend/girlfriend relationship.

During the conversation between Williams and West, Williams was overheard commenting "folk looking out," which meant that once the victim started making money in prostitution, West would pay Williams for bringing the victim to West. Williams also suggested to West that if West gave the victim meth "she will do anything." [9]

Shortly after meeting West and Wells, the victim told them that she was 17 years old.[10] The victim told West and Wells that she was trying to get back to Fort Worth in order to get a government ID and get back on her feet. West and Wells told her that they were going that way but they needed to stop in Arizona first.

While in El Paso, West and Wells bought the victim food, toiletries and clothes. Wells styled the victim's hair and helped her with her makeup. West and Wells took photos of the victim. West and Wells used online advertising to arrange for the victim to engage in sexual encounters, meeting strangers in motel rooms and exchanging sex for money. West provided money in order to purchase the online ad space. West told the victim how much she would charge for sex acts. West instructed the victim to hide the money after she received it from the customer. When the "date" was completed, the victim was to give the money to West.

Some of the phones used for the solicitation of commercial sex acts were

---

Based upon West's promises, Wells believed that if she worked hard for 30 days, she could stop working as prostitute because West was going to get a place for them (West, Wells and their baby, Marcus West, Jr.). At some point during their time together, Wells became jealous of the victim. She believed that West was treating the victim like a girlfriend and treating Wells like a prostitute.

[9] According to the victim, Wells introduced her to methamphetamine, putting it in her drink and encouraging her to snort it. However, the text messages between West and Williams corroborate the arrangement and victim's drug addiction: "[w]hat you want for the bitch. She get high. She does all kinds of shit. Stacks bread all day."

[10] The defendants dispute this fact but the text messages between West and Wells support that they knew the victim was a minor: "[w]hen Feb comes & she 18 I'm fucking her & I will be sure to let you know;" "[u]nderage girl across state lines."

registered to West and used by both West and Wells.  Communications with customers and between West and Wells were accomplished through text messages on these phones. The text messages included communications about prostitution, rates, and responses to inquiries by "johns."  Text messages between West and Wells describe the victim as "new," "young" and "uncomfortable with performing [sex acts]" as well as a reference to the victim's past sexual abuse.  In one particular text, after Wells informed West of the victim's performance, West replies with his approval.

In El Paso, Wells and the victim engaged in commercial sex acts without about 15-20 men.  Then West transported the victim from El Paso to Tucson, Arizona.  The victim believed that after she went to Tucson, West would then take her to Fort Worth, Texas.  West left the victim at a motel in Tucson and then returned to El Paso to transport Wells and their baby to Tucson.

Once in Tucson, they (West, Wells and the victim) changed motels a couple of times. During part of their stay in Tucson, West was posting ads for the victim. [11]  At the Comfort Inn in Tucson, Wells and the victim took "dates" and West gave them meth.  At the Red Roof Inn, Wells had a room separate from West and the victim.  For part of the time, the victim took "dates" by herself under the direction of West.   At some point, while staying at the Red Roof Inn, the victim and Wells again took "dates" together. When the UC inquired about a date, West corresponded with the UC through text messages and Wells spoke with the UC on the phone.  Once the "date" was confirmed, West left the motel room before the UC arrived.

After TPD arrested West, he provided a statement.  He initially denied knowing the victim.  He then stated he knew her for two weeks.  He added that he had oral sex with the victim but he did not know she was a minor.  He also denied that Wells and the

---

[11] Text messages indicate that at some point West and Wells argued over West's role in the operation to which West responded that he helped with "pics and texts."  There were text messages that indicate Wells asked West to put money on the card or give her the card number so that she could post ads.  In addition another text message indicated that West had control over the posting of ads for the victim as the victim asked Wells "if [t]hey were going to do a "two girl special[?]… so that Marques knows what to put in my post."

- 7 -

victim were engaged in commercial sex and claimed no knowledge about backpage.com. He denied receiving money from Wells or the victim. In short, he denied being a pimp. However, the evidence contradicted his denials.

History and Characteristics of the Defendant:

The history and characteristics of the defendant support a sentence of 216 months imprisonment. The defendant has a felony conviction for aggravated assault in which he pled guilty to assaulting Tyhesha Grimes, his girlfriend at that time (PSR pp. 6-7, ¶32). He was sentenced to 5 years imprisonment and was released from prison on August 9, 2010. He was on a period of supervised release from August 9, 2010 to May 15, 2011. Even when he was incarcerated, he received eight disciplinary infractions, two were major, one of which involved possession or manufacturing a weapon. (PSR p. 7, ¶32).

West associates himself with the Gangster Disciples, a gang which has its origins in Chicago, Illinois. This is evidenced by the defendant's tattoos (See PSR p. 2).[12] West is also known by the alias of "Chi". During the investigation of this matter, officials at the Yuma Department of Corrections intercepted a letter sent by West to his former cellmate, who was incarcerated at the prison at that time. The letter dated February 17, 2013, reveals the mindset set of the defendant to a degree of certainty that is absolutely chilling. (See Exhibit A). It reflects the inner workings of a person who takes advantage of females for the purpose of prostitution. "I got me a few hoes and been pimping".[13] When talking about the victim in this case, West wrote "…the bitch said she was 18 but the hoe was really 17…I took the bitch with me and the other hoes to Tucson…." Finally, West concluded his correspondence by stating that he was ready

---

[12] West also has a tattoo that reads "fuck a bitch."

[13] Prostitution activities are commonly referred to "the game." A person who functions as a pimp is at the top of the game. Through rules and actions, they control and manipulate the actions of others subordinate to them. Williamson, C. and Cluse-Tolar, T., Pimp Controlled Prostitution: Still an Integral Part of Street Life, *Violence Against Women*, 2002:8; 1074, 1079 (Sept. 2002).

1  "…[t]o go back to Chi and lay low…."

2  However, West did not flee nor did he stop engaging in prostitution activities. The
3  defendant was arrested in El Paso, Texas on April 30, 2013 for promoting prostitution. A
4  warrant currently exists for that offense. (PSR p. 7, ¶38).  On September 11, 2013, West
5  was arrested on the Indictment warrant at the home of his current girlfriend, Brandi
6  Gooden. [14]

7  West has supported himself primarily through pandering and sex trafficking.
8  (PSR p.9 ¶53).  But for the anonymous tip, it is highly likely that West would have
9  continued exploiting females for his financial gain.  In sum, West's history and
10 characteristics demonstrate a lack of respect for people, particularly females, for the law,
11 and an intention to continue to break the law.

12 The need for the sentence imposed:

13 A sentence of imprisonment of 216 months imprisonment is necessary in order to
14 reflect the seriousness of the offense, promote respect for the law, provide just
15 punishment, and adequate deterrence as well as protect the public from further crimes of
16 the defendant.  See, 18 U.S.C. §3553(a) (2) (A) (B) &(C).  In short, West should be held
17 accountable for his criminal conduct.

18 Seriousness of the Offense:   The factual basis contained in the plea agreement and
19 the factual basis articulated during the plea colloquy clearly establish that West
20 knowingly transported the victim across state lines before the victim has attained the age
21 of 18 years old.  Further it established that West intended the victim to engage in
22 commercial sex acts for which he could be charged criminally.  Interstate Transportation
23 of Minor for Prostitution is a crime of violence.  See U.S. v. Williams 529 F. 3d 1 (1st Cir.
24 2008) cert. denied, 129 S. Ct. 1580 (2009) (the crime is categorically a crime of violence
25 for career offender analysis).  By knowingly transporting the victim with the intent that

---

[14] West has children with Tyhesha Grimes, Champagne Wells and Brandi Gooden. He also references the birth of another daughter in his letter to his former cellmate. The identity of the female is unclear.

she engage in prostitution, a perpetrator deliberately "place[s] the minor in harm's way," *Williams*, 529 F.3d at 6.  As the *Williams* Court pointed out, in violating this statute, a perpetrator purposely presents a serious potential risk of violence, physical injury or disease to the minor victim. *Id.*  The Ninth Circuit holds a similar view, determining that a prostituted minor faces risks of physical violence and sexually transmitted diseases. *U.S. v. Carter*, 266 F.3d 1089, 1091 (9th Cir. 2001).   Here, there is no doubt that West, by himself, transported the victim across state lines with the intent that she engage in prostitution.  In doing so, he placed the victim in further harm, in order to make money.

Need to protect the public:  The clear intent of Congress in enacting 18 U.S.C. §2423(a) was to provide protection for minors. *United States v. Taylor*, 239 F.3d 994, 997 (9th Cir. 2001) (citing H.R.Rep. No. 105-557 (1998), U.S. Code Cong. & Admins. News 1998, 678).  A sentence of 216 months protects the public from any further crimes by West.

Initially the victim denied her involvement in prostitution with West and Wells. The victim told the FBI that prostituting was her idea because she did not want West and Wells to get into trouble since they had a baby.  When the victim disclosed, she minimized West's role, stating that she gave him her money so that she would not spend it.  When pressed, she claimed that her memory had "blurry spots," attributing that to the narcotics she had ingested.

As the Ninth Circuit stated "[b] and large, the relationship between prostitutes and pimps is not the subject of common knowledge." See *Taylor*, 239 F.3d at 998; see also *United States v. Anderson*, 851 F.2d 394, 392-93(D.C.Cir.1988) (affirming the relevance of expert testimony on the nature of the relationship between pimps and prostitutes in a sex trafficking case).  Indeed, why a victim would minimize the culpability of those for whom she worked can be complex and beyond common knowledge.  However, West's part in the serial victimization of the victim is apparent.   West used the victim's emotional, financial and drug dependence to his advantage.   He knew that she suffered from substance abuse when he met her.  He knew that she had no financial or family ties

and that she was trying to get back on her feet.  Instead of helping her as he promised, he exploited her, had sex with her, and pocketed her money.[15]

Need to avoid unwarranted sentencing disparities:

The Court must consider in imposing a sentence under §3553(a)"the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a).   The goal of uniformity in federal sentencing has been reaffirmed by the Supreme Court.  See *Gall* 522 U.S.  at 49.  ("As a matter of administration and to sure nationwide consistence, the Guidelines should be the starting point and the initial bench mark.")  Here, a sentence of 216 months imprisonment does not create unwarranted sentencing disparity.  It is fair, just and reasonable under the circumstances.

West and the co-defendant are not similarly situated and therefore, comparison of their respective sentencing ranges in their respective plea agreements is not warranted.  The sentence range for West and Wells are only similar to the extent that both defendants received the bargain of their plea agreements.  Wells pled guilty to Information and received a range of imprisonment based upon the charge and her criminal history.  West's plea range reflects his charges, criminal history and provides for a reduced range of exposure from 235 to 293 months to 144 to 216 months imprisonment, based upon the dismissal of some of those charges.

A sentence of 216 months imprisonment, the high end of the sentencing range in the plea agreement, reflects the kinds of sentences available federally.  *See, e.g. United States v. Watkins*, 667 F.3d 254 (2nd  Cir. 2012)(sentence of 233 months imprisonment reasonable for violation of 18 U.S.C. §2423(a)); *United States v. Washington*, 743 F.3d 938 (4th Cir. 2014)(term of 240 months, reflecting upward variance found reasonable for

---

[15] The victim has endured a continuum of hardship and abuse.  During the pendency of this matter, she had a high risk pregnancy that delayed her ability to travel to Arizona for a scheduled court date.  Subsequently, it was discovered that she had been exposed to drugs during her pregnancy.

violation of 18 U.S.C. §2423(a)); *United States v. Grubbs*, 585 F.3d 793 (4th Circ. 2009)(defendant's sentence of 240 months imprisonment for guilty pleas to multiple counts of violating 18 U.S.C. §2423(a) and 18 U.S.C. §2423(b) reasonable).  See also, *Philips v. U.S.*, 668 F.3d 433 (7th Cir. 2012) (sentence of 210 months affirmed and vacated in part); *U.S. v. Patterson*, 425 Fed. Appx. 519(7th Cir. 2011) (unpublished opinion) (sentence of 262 months included career offender characteristics); *U.S. v. Acosta,* 388 Fed. Appx. 620 (9th Circuit 2010) (unpublished opinion) (262 months substantively reasonable).

## Conclusion

The Court should sentence defendant to 216 months imprisonment as it is reasonable in consideration of the proffered information, the advisory guidelines, and the 18 U.S.C. 3553(a) sentencing factors.

Respectfully submitted this 20th day of June, 2014.

JOHN S. LEONARDO
United States Attorney
District of Arizona

*s/Karen E. Rolley*

KAREN E. ROLLEY
ARTURO A. AGUILAR
Assistant U.S. Attorneys

Copy of the foregoing served electronically
or by other means this 20th day of June, 2014, to:

Janet Altschuler, Esq.
Brian Hoffman, U.S.S.P.